[Civ. No. 5897. Third Appellate District.—December 10, 1937.]

BESSIE WARE, Respondent, v. DEWEY CULP, Appellant.

Rich, Weis & Carlin, Redman, Alexander & Bacon and Herbert Chamberlin for Appellants.

McDaniel & Mahon for Respondent.

THE COURT.—The defendant, Dewey Culp, doing business as Yuba City General Hospital, has appealed from a judgment which was rendered against her for injuries sustained by the plaintiff while she was a patient in that hospital under the charge of a private physician in the hospital. The plaintiff was seriously burned by an electric pad which was applied to the calf of her left leg by a special nurse who had charge of the case at the time of the accident. It is contended the defendant is not responsible for the negligence of the special nurse for the reason that she was employed by the plaintiff and had sole charge of the patient under the supervision of a private physician.

Dewey Culp owns and operates a public hospital in Yuba City, under the name of Yuba City General Hospital. This hospital was patronized by local patients, many of whom were taken there for treatment under the supervision of their private physicians. At the time of the accident in question there were nine patients in the hospital. At least one of these patients, besides the plaintiff, was in charge of a special nurse. The defendant provided two general nurses at that time, who were regularly employed in the hospital. Miss Lucille Walton, a registered nurse, in the regular employ of the defendant, had general supervision of the hospital at the time the accident occurred. The hospital kept a list of special nurses which it recommended to patients for employment in serious emergency cases. Dr. Benjamin F. Miller, a duly qualified and experienced physician, located at Yuba City, was engaged in practicing his profession in that locality only a short time before the accident. He did not know any local special nurses. November 10, 1935, the plaintiff was suffering severely and she sent for Dr. Miller. He visited her and found that she was afflicted with a "bad heart and kidney infection". Upon the doctor's advice the plaintiff was taken to the Yuba City General Hospital. For several days she remained in the hospital receiving only the

care of the general nurses under the supervision of her physician, who frequently visited her. At 9 o'clock on the night of November 18th, the doctor found his patient suffering very severe pain in her legs. Her limbs were massaged, and she was otherwise treated to relieve the pain. The doctor then left the hospital. About 2 o'clock the following morning Miss Edna Silvey, a general night nurse in the hospital, found the plaintiff suffering excruciating pain in her legs. After consulting Miss Lucille Walton, her superior nurse, Doctor Miller was called. He arrived in about twenty minutes, and found the plaintiff writhing in pain caused by arterial spasms as a result of thrombosis. She was hysterical. Her legs were numb and cold; the circulation of blood was obstructed, and the limbs lacked normal sensation. The doctor promptly administered morphine and nitro-glycerine tablets to relieve her pain. She subsequently lost consciousness. After massaging her legs and otherwise treating her for her ailment, the doctor directed Miss Silvey, the general nurse, to apply heat to the patient's limbs. This was first done by the use of hot-water bottles and heated blankets. The doctor then directed the nurse to substitute electric pads for the hot-water bottles. This was done. Two of them were procured. They were in perfect condition. One was placed under the calf of the left leg. The other was placed at her thigh. The limbs were then covered with flannel. The pads were connected with electric plugs in the wall, and they were switched on low temperature and left in that condition. The doctor remained in actual charge of the patient until after a special nurse was called and arrived at 5 o'clock in the morning. During that time he frequently examined the limbs and testified that no burn occurred until after the special nurse took charge of the case. The court so found at the trial of the case. There is no evidence to the contrary. The doctor said in that regard:

"Mr. Rich: In your opinion there was no burn on that leg until the time you left? A. No, I didn't see any burn there. Q. If a burn took place it was after the special nurse came on the job, is that right? A. Apparently."

After the doctor and the general nurses had done what they could to relieve the patient's suffering, a consultation was held between the two regular nurses and Mrs. Littlejohn, who was a special nurse in charge of a patient under the su-

pervision of Dr. Hoffman. They thought the serious condition of Mrs. Ware made it advisable to have a special nurse. Miss Walton, the head nurse, asked Dr. Miller if he did not think he should have a special nurse for Mrs. Ware. The doctor said: "Yes, it would be perfectly all right." He then asked, "Is there anyone close by?" to which inquiry Mrs. Littlejohn said there was a nurse by the name of Mrs. May Hull who had just completed her work on another case and that she lived down the alley about a block away, and was probably available. The doctor replied, "That is fine, can you go and get her?"

In regard to the employment of a special nurse the doctor testified:

"I was right there giving her [the plaintiff] medication and watching her and one of the nurses said 'don't you think she needs a special' and I said 'it would be advisable'."

Mrs. Hull, the special nurse, was called and arrived within a few moments. The doctor explained to her the condition of the patient, giving the nurse general instructions regarding her care, and warned against permitting the electric pad to get too hot. He then left the hospital. After that time Mrs. Hull had sole charge of the plaintiff. She was not thereafter assisted by any of the regular hospital nurses. She was not in the regular employ of the hospital. She was neither employed nor paid by the hospital on this occasion. Apparently she was not subject to directions from the nurses or authorities of the hospital with respect to her care of the plaintiff. When her services were dispensed with, she was paid by the plaintiff, and not by the hospital. Regarding the employment of special nurses, the defendant, Dewey Culp, testified:

"We have a list of nurses who register with us for special duty. When they are on duty they phone in and tell us so that we will know not to bother calling them for a case. When a special is required by a patient the case is referred to the doctor for his judgment as to whether a nurse shall be called or not. If he says a nurse should be called he is given a list of the nurses available at that time. Q. And makes a selection from them? A. Yes. Q. Have you ever, on your own initiative, procured the services of any special nurse without the direction of the doctor? A. No. . . . Q. Do I understand that a special nurse isn't procured until directed by the doctor in charge? A. A special is not procured until

the doctor orders it. . . . Q. You say positively, of your own knowledge, that Mrs. Hull was not in your employ? A. She was not. Q. And Mrs. Littlejohn was not? A. She was not. . . . Q. Did you have authority to hire or fire any special nurse? A. No.''

The record contains no testimony in conflict with the foregoing evidence. At 9 o'clock on the morning when Mrs. Hull took charge of the case it was discovered the plaintiff had been very badly burned on the calf of her left leg over the area which came in contact with one of the electric pads. The doctor was promptly called and found that she had suffered a very severe third degree burn. He testified in that regard: ''The electric pad was not overheated, but I believe the electric pad was left too long after 5 a. m. The skin tissue was so void of circulation that even a warm pad would have caused the burn.'' The flesh sloughed away, exposing the bone. The wound became ulcerous and aggravated. She was confined to the hospital on that account for several weeks. The plaintiff was then compelled to go about on crutches. The doctor testified that she was likely to suffer from that injury throughout her life; that the injury was permanent.

Suit for damages was brought against Dewey Culp, as sole owner of the hospital. Neither the physician nor the special nurse in charge of the case was made defendant in the action. The cause was tried before the court sitting without a jury. The special nurse, Mrs. Hull, was not called as a witness by either party, although she was present in the court room during the trial. The court found that Mrs. Hull, the special nurse, attended the plaintiff professionally at the special instance and request and in behalf of the defendant, and that ''After her arrival and after the departure of Dr. Miller through and because of the carelessness and negligence of said nurse, Mrs. Hull, in applying said electric pad to plaintiff's left leg [she] was burned by the electric pad.'' Judgment for $7,600 was rendered in favor of the plaintiff. A motion for new trial was denied. From the judgment and order denying a new trial the defendant has appealed.

It is contended the evidence fails to support the court's finding that the special nurse, Mrs. Hull, was acting as the servant or employee of the defendant, at the time the plaintiff was burned as a result of the nurse's negligence.

On the contrary it is asserted the evidence is undisputed that the special nurse, through whose negligence the plaintiff was burned, was exclusively the employee of the plaintiff, subject only to the control and directions of her private physician, and that the defendant, therefore, is not liable for the negligence of plaintiff's private nurse.

Assuming, without so deciding, that a special nurse might be employed by a general hospital for the care of a patient under circumstances which would render the hospital liable for her negligence, that relationship between the hospital and the nurse depends upon the contract which exists. The burden of proving that relationship rested on the plaintiff in this case. She utterly failed to establish any such relationship. The evidence in this case appears to be just the contrary. According to the usual custom the special nurse was employed by the plaintiff in this case through her representative, Dr. Miller. Through Miss Walton, a general nurse in the hospital, the name of a special nurse was suggested to the doctor. He approved the suggestion and requested that her service be procured. He personally waited at the hospital until she arrived. He then turned his patient over to her exclusive charge. There is no evidence that any general nurse or employee of the hospital ever saw the plaintiff or attempted to direct or advise the special nurse with respect to the care of the patient after she took charge of the plaintiff until after the accident occurred. Apparently the special nurse took absolute charge of the patient, independently of any interference or control on the part of the nurses or employees of the hospital. The defendant testified she had no authority to hire, dismiss or control the conduct of the special nurse in her treatment of the patient. The defendant testified that she did not employ the special nurse. When the services of the special nurse were dispensed with, she was paid directly by the plaintiff and not by the defendant. No item for her services was included in the hospital bill. There is no substantial evidence that the special nurse was an employee of the hospital with respect to the services which she performed for the plaintiff. We are driven to the conclusion that the special nurse was in the employ of the plaintiff subject to the exclusive control and directions of her private physician, Benjamin F. Miller.

Ordinarily, in the absence of an agreement to the contrary, a general hospital is not liable for the negligence of either an attending physician or nurse on account of unprofessional conduct.

It has been frequently held that a general hospital is not ordinarily liable for injuries to a patient resulting from mistakes which occur in the manner of the professional treatment of a patient by a nurse or a physician for the reason that their professional treatment is not subject to control or directions by the administrative officers or employees of the hospital. Of course there may be a liability on the part of a hospital if its administrative officers are negligent in employing an incapable nurse through whose carelessness or lack of ability in the course of her duties the patient is injured. It is not claimed the hospital in this case was guilty of negligence in employing an incapable nurse. In the case of *Brown* v. *St. Vincent's Hospital*, 222 App. Div. 402 [226 N. Y. Supp. 317], note 60 A. L. R. 303, it is said:

"The general rule is well settled that . . . the hospital does not accept responsibility by contract, or become liable in tort for the acts of physicians, surgeons or nurses who treat patients in the institution."

And in the case of *Schloendorff* v. *Society of New York Hospital*, 211 N. Y. 125 [105 N. E. 92, Ann. Cas. 1915C, 581, 52 L. R. A. (N. S.) 505], in holding that a nurse does not ordinarily sustain the relationship of a servant or employee of a hospital in administering professional treatment, it is said:

"It is true, I think, of nurses as of physicians, that, in treating a patient, they are not acting as the servants of the hospital. The superintendent is a servant of the hospital; the assistant superintendents, the orderlies, and the other members of the administrative staff are servants of the hospital. But nurses are employed to carry out the orders of the physicians, to whose authority they are subject. The hospital undertakes to procure for the patient the services of a nurse. It does not undertake, through the agency of nurses, to render those services itself. The reported cases make no distinction in that respect between the position of a nurse and that of a physician . . . ; and none is justified in principal. If there are duties performed by nurses foreign to their duties in carrying out the physician's orders, and hav-

ing relation to the administrative conduct of the hospital, the fact is not established by this record, nor was it in the discharge of such duties that the defendant's nurses were then serving.''

The last paragraph of the preceding quotation applies directly to the facts of the present case. The plaintiff in this case was injured by the negligence of her special nurse in the careless performance of her professional duties and not in carrying out administrative duties of the hospital. The court so found. There is no evidence to support any other theory regarding the manner in which the injury was sustained.

In accordance with the preceding declaration of law regarding the liability of a hospital for the negligence of a professional nurse who is assigned to care for a patient therein, in the case of *Moody* v. *Industrial Acc. Com.*, 204 Cal. 668 [269 Pac. 542, 60 A. L. R. 299], the hospital was held to be exonerated from liability and an award of the industrial accident commission was therefore annulled. It was there determined the nurse was performing an independent professional service for the patient and that such services distinguished her from a mere ''employee''. The court said:

''The following definition may be regarded as a correct statement of what constitutes an independent contractor: One who renders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished. . . . 'It is well settled that where one person is performing work in which another is beneficially interested, the latter may exercise over the former a certain measure of control for a definite and restricted purpose without incurring the responsibilities, or acquiring the immunities, of a master, with respect to the person controlled.' . . . 'The decisive test of the relationship is: Who has the right to direct what shall be done, and when and how it shall be done? Who has the right to general control? . . . In other words, the test of what constitutes independent service lies in the control exercised. The test of control means complete control, and we must carefully distinguish between authoritative control, and mere suggestion as to detail. . . .

" 'Ordinarily a trained nurse, performing her usual duties with the skill which is the result of training in that profession, does not come within the definition of a servant, but rather is one who renders personal services to an employer in pursuit of an independent calling.' . . . The professions of doctor and nurse are so closely allied that decisions applicable to one would appear to apply equally well to the other. In the great majority of instances the inference, that it is the implied intention of the parties to contracts for the services of a medical practitioner that he is not to be under the employer's control with respect to the details of his work, is corroborated by the consideration that the employer is a person who does not possess the technical skill which would qualify him to exercise such control, and that it would, for that reason, be highly inexpedient for him to attempt to exercise it. (19 A. L. R. 1186.) 'There is no more distinct calling than that of the doctor, and none in which the employee is more distinctly free from the control or discretion of his employer.' "

It is unreasonable to assume that a physician or a professional nurse is subject to the direction and control of the administrative officers of a hospital with respect to their professional care and treatment of a patient.

To the same effect is the case of *Payne* v. *Santa Barbara Cottage Hospital*, 2 Cal. App. (2d) 270 [37 Pac. (2d) 1061], where a judgment against the hospital for the negligent failure on the part of a trained nurse to remove from the abdomen of a patient upon whom an operation was performed, a "toothpick applicator" before the incision was closed. That judgment was reversed on the ground that the hospital was not liable for damages. It is there said:

"The hospital, if it furnished the toothpicks as plaintiff contends, sent them to a professional [nurse] employed by plaintiff to care for him. . . . It cannot rightly be said that defendant or its employees should have anticipated that the nurse or physician would voluntarily use an unfit appliance in caring for the patient's wound."

In the last-mentioned case, a hearing was denied by the Supreme Court. The facts of that case appear to conform to the present case in principal. In this case the hospital did supply the electric pad which caused the injury. It is not contended the pads were defective. The only evidence

in that regard is to the effect that they were not defective. They were merely used by the special nurse improperly by applying them to the leg of the plaintiff for too long a period of time. That was clearly the professional dereliction of the nurse over whom the administrative officers of the hospital had neither the control, nor the right to direct her conduct in that regard. Clearly the hospital is not liable for such conduct over which it possessed no authority. In that regard the nurse was not acting as the employee of the hospital.

In the case of *Timbell* v. *Suburban Hospital, Inc.*, 4 Cal. (2d) 68 [47 Pac. (2d) 737], the plaintiff sued both the hospital and a special nurse for injuries received while she was a patient in the hospital, by being burned by the application of a hot-water bottle. A jury returned a verdict in favor of the nurse, but against the hospital. On appeal the judgment was affirmed on the theory that the plaintiff was burned through the negligence of "an employee of the hospital" and not by the act of the nurse. The court said:

"It must be assumed that the jury concluded that the injury occurred *at the instance of the regular employees of the hospital who had charge of the patient when Miss Lane was not present.*"

The question as to whether that finding was supported by the evidence was not raised on appeal. It is not discussed. We must assume there was ample evidence in that case to support that finding. It is there assumed the special nurse was employed by the plaintiff's physician, and not by the hospital. The circumstances of her employment were similar to those of the present case. There is nothing in that case in conflict with what we have previously said regarding the responsibility of a general hospital for the negligence of a special nurse who is employed by a patient therein.

The doctrine of *res ipsa loquitur* cannot aid the plaintiff under the circumstances of this case. Notwithstanding the fact that the hospital furnished the electric pads, they were under the exclusive control of the doctor and the special nurse, after she took charge of the patient. There is no evidence that any general nurse or employee of the hospital undertook to direct or control their use after the special nurse took charge of the case. There is no evidence that such employees even entered the room of the patient there-

after or knew anything about the manner in which the electric pads were being used. The undisputed evidence is that the injury occurred after 5 o'clock in the morning while the special nurse, Mrs. Hull, was in absolute charge and control of the patient and of the use of the electric pads. The court so found. There is no room for the application of the doctrine of *res ipsa loquitur* under such circumstances.

For the reasons assigned we are impelled to hold the court's finding that the plaintiff was injured through the negligence of an "employee of the hospital" and that it is therefore liable for damages is not supported by the evidence.

In view of the foregoing determination of the question of liability of the hospital for the negligence of the special nurse, it becomes unnecessary to pass upon the asserted excessive amount of the judgment.

The judgment is reversed, and the court is directed to render judgment in favor of the defendant.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 8, 1938, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 7, 1938.