Filed 2/22/24  Chapman v. Aloha Dive Shop CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| DONNA CHAPMAN, | B322703 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC713453) |
| ALOHA DIVE SHOP et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Judge.  Affirmed.

Gregory B. Byberg for Plaintiff and Appellant.

Pollak, Vida & Barer, Daniel P. Barer, Anna L. Birenbaum; Hewitt & Raphael, Stephen L. Hewitt and Patricia M. Bakst for Defendants and Appellants.

\* \* \* \* \* \*

A man in his 50s training to become a SCUBA[1] diver died soon after resurfacing from his fifth dive in the open ocean. His mother sued the dive instructor as well as the dive shop and its owner for wrongful death, and a jury awarded her more than $1 million in damages. The trial court overturned the jury verdict after finding no evidence that any gross negligence by the dive instructor, the dive shop, or its owner *caused* the man's death. We independently conclude that there is no substantial evidence supporting the element of causation, and thus affirm the trial court's order granting judgment notwithstanding the verdict.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

In September of 2016, Christopher Gallie (Gallie) went to the Aloha Dive Shop (located in the San Fernando Valley) to learn how to SCUBA dive. The Aloha Dive Shop was owned and operated by Christopher Russello (Russello). This was not the first time Gallie started this process; he had signed up with a different dive shop in 2013, and had obtained a medical clearance to dive—which was necessitated by Gallie's age and self-identification as a smoker—but he did not provide this clearance to the Aloha Dive Shop. Gallie signed a waiver form absolving the Aloha Dive Shop and its instructors of liability for anything but gross negligence.

---

[1]     SCUBA is an acronym for Self-Contained Underwater Breathing Apparatus.

2

SCUBA dive training involves three educational components: (1) academic instruction and testing, (2) practice dives in a confined body of water like a swimming pool using SCUBA equipment, and (3) open water dives in the ocean. A certified dive instructor must supervise each step. Deborah Nusbaum (Nusbaum) acted as Gallie's dive instructor; because Nusbaum was not certified as an instructor until shortly before Gallie began the open water dives, Russello supervised her for the earlier portions of Gallie's training.

Gallie was unable to complete the academic instruction and testing online—which should have taken him around five hours to complete—so Nusbaum instead provided him more than eight hours of classroom instruction and testing.

Gallie completed his pool dives.

Gallie completed three ocean dives on his first day of open water dives in the Two Harbors area of Catalina Island on November 6, 2016. The dives were "uneventful."

Gallie ventured to the same area of Catalina for a second day of open water dives on December 3, 2016.

Russello supervised Gallie's first dive that day. Because Gallie looked "uncomfortable" in the water and "panicked," Russello ordered him out of the water and told him, "The dive is done." Gallie insisted that he do another dive, but with Nusbaum.

Nusbaum supervised Gallie's second dive that day. They descended in tandem to 20 to 25 feet below the ocean's surface, where Nusbaum tested Gallie's skills for 15 minutes. Then Gallie suddenly "took off" for the bottom of the ocean, descending to 82 feet below the surface. Nusbaum gave chase; when she caught up with him at 82 feet below, she used hand signals to verify that

Gallie was "okay." Nusbaum then started a guided and regulated ascent, to ensure that Gallie did not ascend too fast. At first, Nusbaum held onto Gallie's buoyancy device with her hands, but eventually let go as they ascended in tandem, face-to-face. When they had ascended to 70 feet below the surface, Gallie "bolted" upward, "kicking hard" and swimming at full speed to reach the surface. Again, Nusbaum gave chase, trying to grab his fins to slow or stop him, but he kept kicking.

When Nusbaum reached the ocean's surface seconds behind Gallie, she questioned him to see if he was suffering from barotrauma because he had ascended at a faster-than-recommended pace. Gallie seemed physically fine as well as mentally coherent. Nusbaum thus resumed the skills check, having Gallie inflate his buoyancy device, swap out his regulator for a snorkel, and start to swim for the current line dragging behind the dive boat.

Once they started swimming along the current line toward the boat, Gallie stopped and told Nusbaum he was tired, so she advised him to just hold onto the line so others could drag the line onto the boat without having Gallie exert himself any further. Gallie then told her he was fine, and resumed swimming. Moments later, Gallie stopped moving. Within seconds, Nusbaum pulled Gallie's head out of the water, put a regulator in his mouth to prevent him from swallowing water, and yelled for help. Three others dove into the ocean and pulled Gallie on board the dive boat, where they administered CPR. Gallie's skin tone was already ashen, and he was declared dead.

## II. Procedural Background

### A. *Complaint*

In July 2018, Gallie's mother, Donna Chapman (plaintiff), sued Nusbaum, Russello and the Aloha Dive Shop (collectively, defendants).[2] In the operative first amended complaint, plaintiff alleged (1) a claim for wrongful death caused by defendants' gross negligence, and (2) a survival claim for compensatory and punitive damages for the harm Gallie endured before he died.

### B. *Jury trial*

The matter proceeded to a seven-day jury trial in April 2022. In addition to calling as witnesses Gallie's mother and brother, the captain of the dive boat, the investigating officer, Russello, Nusbaum, and competing experts on whether Russello and Nusbaum acted in a grossly negligent manner, plaintiff and defendants each presented an expert witness on the issue of causation.

Plaintiff called Dr. Vadims Poukens, the deputy medical examiner with the coroner's office who had performed the autopsy on Gallie. After completing a physical examination, X-ray, toxicology examination, and microscopy examination of Gallie's body, Dr. Poukens opined that he had found no physical injury or physical evidence of any natural cause of death, found no toxicological or microscopic cause of death, found no evidence of a stroke or heart attack, found no evidence of an air embolism (which happens when a too-rapid ascent causes air bubbles to form in the bloodstream or internal organs), and found no evidence of any salt water in Gallie's lungs or stomach (which one

---

[2] Plaintiff also sued the boat and its owners that transported Gallie to his fatal dive. Plaintiff did not proceed to trial against those parties, so we do not discuss them further.

would "expect to find" if a person had experienced aspiration or asphyxiation from drowning).[3]  Dr. Poukens frankly admitted that he "could not find any evidence . . . to conclude that [Gallie's] death was the result of any specific mechanism."  However, because Dr. Poukens had a "duty" to list *something* as the "official cause of death," and because coroners use the label "drowning" when they cannot explain a death that happened in the water, Dr. Poukens listed the "official cause of death" on Gallie's death certificate as "drowning."  At no point did Dr. Poukens opine to any reasonable medical probability that Gallie died from a particular mechanism or that Gallie's death was caused by anything defendants did or did not do.

Defendants called Dr. John Millington, a physician specializing in hyperbaric medicine.  Dr. Millington initially suspected that the two "most likely" causes of Gallie's death were either arrythmia (an irregular heartbeat) or an air embolism.  But because there was "no . . . evidence" of arrythmia (which can be detected only as it is happening and leaves no postmortem trace), Dr. Millington opined that "the most likely" causes—which he ranked a "50/50"—were either an air embolism or "sudden death syndrome," the term used when middle-aged men "all of a sudden just go into . . . severe arrythmia" when swimming back to a dive boat.  In light of the absence of any evidence of "what caused [Gallie's] death from a physical, anatomical, microscopic" or "historic" "standpoint," Dr. Milligington ultimately opined that he could not "say to a medical certainty what the cause of . . . Gallie's death was."

---

[3]      Testing of Gallie's SCUBA equipment also uncovered no issues.

6

After the jury returned three defective special verdicts and the court on each occasion ordered the jurors to resume deliberations, the jury returned a special verdict finding defendants grossly negligent in causing Gallie's death, attributing 70 percent of the fault to Nusbaum and 30 percent to Russello,[4] and awarding plaintiff $60,950 in past economic damages and $1 million in past noneconomic damages.

## C.   *Posttrial motions*

Defendants moved for judgment notwithstanding the verdict (JNOV) and for a new trial.  Following full briefing and a hearing, the trial court issued a 12-page order granting both motions.

The court granted defendants' motion for a JNOV after finding "insufficient evidence to support the [jury's] verdict that defendants' acts, considered either individually or collectively, were a cause of . . . Gallie's death."  Specifically, the court noted that there was "no evidence that Gallie's death was caused to a reasonable medical probability by the SCUBA dive" and "no evidentiary showing of a causal connection between any deficiencies in Gallie's SCUBA instruction and [his] unfortunate death."  Although Dr. Poukens had listed the official cause of death as "drowning," the court noted the undisputed evidence that Dr. Poukens had "found no physical evidence of drowning."

As an alternative ruling, the court also granted defendants' motion for a new trial on the grounds that (1) the evidence of causation was "insufficient," (2) the evidence of gross negligence was "insufficient," (3) plaintiff's attorney had prejudicially

---

4      The jury also found Gallie negligent but that his negligence was not a substantial factor in causing his death and therefore attributed no percentage of responsibility to him.

misrepresented Dr. Poukens's opinion during closing argument, and (4) the jury's special verdict was internally inconsistent.

### D. *Appeal*

Plaintiff filed a notice of appeal on August 2, 2022—*after* the trial court had issued its order granting posttrial relief but two days *before* the court had entered judgment for defendants. We exercise our discretion to treat plaintiff's premature notice of appeal as effective.[5] (E.g., *Boyer v. Jensen* (2005) 129 Cal.App.4th 62, 69.)

## DISCUSSION

Plaintiff argues that the trial court erred in granting defendants' motion for JNOV and a new trial.[6]

An order granting JNOV is appropriate "'only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict.'" (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.) We independently review the substantiality of the evidence. (*Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.* (2014) 231 Cal.App.4th 1131, 1143.) "Of course, the substantiality of the evidence is measured against the elements the plaintiff must prove; what those elements are, and what they

---

[5] Defendants also filed a "protective" cross-appeal, which we dismiss as moot.

[6] Defendants ask us to treat plaintiff's appeal as waived due to deficiencies in the opening brief and significant omissions in the appendix plaintiff prepared. Although we agree with defendants that plaintiff's briefing and appendix do not comply with the California Rules of Court in many respects, we will not punish plaintiff for her lawyer's shortcomings and exercise our discretion to reach the merits of her appeal.

8

mean, are questions of law that we also independently review." (*Lopez v. City of Los Angeles* (2020) 55 Cal.App.5th 244, 253.)

To prevail on a claim for wrongful death, a plaintiff has the burden of proving (1) the defendant engaged in negligent conduct (or, in this case, grossly negligent conduct); (2) the victim died; and (3) the defendant's grossly negligent conduct *caused* the victim's death. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 390 [elements of wrongful death]; *Chavez v. 24 Hour Fitness USA, Inc.* (2015) 238 Cal.App.4th 632, 640 [same elements apply, even when standard is gross negligence].)[7]

To establish the element of causation, the plaintiff must establish that it is "reasonably probable"—that is, more probable than not—that the defendant's negligent (or, here, grossly negligent) conduct caused the victim's death. (*Beebe v. Wonderful Pistachios & Almonds LLC* (2023) 92 Cal.App.5th 351, 370; *Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1314; *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118.) The plaintiff need not prove this causal link by excluding all other possible causes of death (*Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 580; *Espinosa*, at p. 1314), but must prove "'something more than a "50-50 possibility"'" (*Belfiore-Braman v. Rotenberg* (2018) 25 Cal.App.5th 234, 247); it is not enough to show a "possibility" of a causal link or to rely upon speculation or conjecture (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402; *Saelzler v. Advanced Group 400* (2001) 25

---

[7] The elements for a survival claim are the same, except that instead of causing the victim's death, the defendant's negligence must cause harm (except for pain and suffering) suffered by the victim prior to death. (Code Civ. Proc., § 377.34.)

Cal.4th 763, 775-776). When causation is beyond the common experience of jurors (as it often is when the cause of death turns on specialized medical knowledge), the plaintiff must present expert testimony linking the cause of death to the defendant's negligence (or, here, gross negligence) to a "reasonable medical probability." (*Jennings*, at p. 1118; see generally *Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1614 ["Where the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation"]; *Pacific Indemnity Co. v. Industrial Accident Com.* (1946) 28 Cal.2d 329, 338 ["cause of death . . . was a question for the determination of medical experts"]; *People v. Sims* (1993) 5 Cal.4th 405, 436 [expert testimony appropriate when assessing cause of death from drowning]; cf. *People v. Catlin* (2001) 26 Cal.4th 81, 146 [cause of death may be within common experience of jurors when it is not medically complex]; *Cavero v. Franklin General Benevolent Society* (1950) 36 Cal.2d 301, 309 (*Cavero*) [cause of injury can be within common experience in situations where a sponge is left in a body or where a patient is burned with hot compresses, which are not medically complex].)

We independently agree with the trial court that plaintiff did not sustain her burden of proving that Gallie's death was "more probably than not" the result of any gross negligence by defendants. There was *no* evidence establishing the actual cause of Gallie's death. Although Dr. Poukens listed drowning as the official cause of death, it is undisputed—by Dr. Poukens himself—that he listed that cause of death because he could not actually find any mechanism for Gallie's death (including any salt water in Gallie's lungs or stomach) and because "drowning" is the default cause of death used when an unexplainable death

10

occurs in the water. "Drowning" is effectively the "none of the above" answer. Thus, plaintiff's assertion on appeal that it is "obvious [that Gallie] died by drowning" is flatly contradicted by the record. Because no witness was able to identify what ultimately caused Gallie's death, it is no surprise that no witness testified that this unknown cause of death was more probably than not linked to anything defendants did or did not do. This void in the evidence is fatal to plaintiff's claims.

Plaintiff makes what boils down to four arguments in response.

First, plaintiff argues that, even if there was no *affirmative* evidence establishing that defendants' acts probably resulted in Gallie's death, a jury could *reasonably infer* causation because all other possible causes of death had been eliminated. To be sure, causation may sometimes be established through a process of elimination. (E.g., *Minder v. Cielito Lindo Restaurant* (1977) 67 Cal.App.3d 1003, 1009; *Brancati v. Cachuma Village, LLC* (2023) 96 Cal.App.5th 499, 506; *George v. Bekins Van & Storage Co.* (1949) 33 Cal.2d 834, 844.) But here, the undisputed evidence eliminated *all* of the causes of death that might be linked to defendants' conduct: Gallie did not drown (potentially caused by gulping water once he surfaced) because there was no salt water in his lungs or stomach; Gallie did not suffer from an air embolism (potentially caused by too rapid an assent) because there were no air bubbles in his blood or his organs; Gallie did not suffer from a heart attack or stroke (from being in the water or from stress) because there was no physical evidence of either. Because there was "'clear, positive, [and] uncontradicted'" evidence that Gallie's death was *not* more probably than not due to anything defendants did or did not do, the inference plaintiff

11

asks us to draw—namely, that Gallie's death must have been due to what defendant's did or did not do—is not a reasonable one; on this record, granting JNOV was appropriate. (*Casetta v. United States Rubber Co.* (1968) 260 Cal.App.2d 792, 814-815 (*Casetta*).) Indeed, were we to ignore the evidence affirmatively eliminating the link between Gallie's death and defendants' conduct, we would in effect be conclusively presuming causation from proof of gross negligence and the victim's subsequent death, thereby eliminating any need for plaintiff to *prove* the element of causation; we decline plaintiff's invitation to rewrite the tort of wrongful death to eliminate that element. (*Youst v. Longo* (1987) 43 Cal.3d 64, 74 [refusing to "essentially eliminate the tort's element of causation"].)

Second, and along similar lines, plaintiff seems to suggest that a wrongful death verdict in her favor might be upheld on a res ipsa loquitur-type theory—namely, that causation should be presumed (unless and until rebutted) because an unexplainable death occurring during SCUBA dive training likely results from gross negligence in that training.

We reject this suggestion for three reasons.

To begin, plaintiff waived this theory because she did not request a res ipsa loquitur instruction below. (*Gagosian v. Burdick's Television & Appliances* (1967) 254 Cal.App.2d 316, 319.)

More to the point, a presumption of causation under res ipsa loquitur is appropriate only when "it can be said, in the light of past experience, that [the victim's injury or death] *probably* was the result of negligence [or, here, gross negligence] by someone and that the defendant[s are] *probably* the person[s] . . . responsible." (*Siverson v. Weber* (1962) 57 Cal.2d 834, 836, italics

12

added; *Faulk v. Soberanes* (1961) 56 Cal.2d 466, 470; cf. *Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 826 (*Brown*) [res ipsa loquitur does not apply to slip and fall cases because they are "not so likely to be the result of negligence as to justify a presumption to that effect"].)[8]  To be "probab[le]," it must be """*more likely than not*""" that the victim's injury or death was the result of (gross) negligence *and* the result of (gross) negligence by the defendant(s).  (*Rodela v. Southern California Edison Co.* (1957) 148 Cal.App.2d 708, 712-713, italics added; *Newing v. Cheatham* (1975) 15 Cal.3d 351, 360 [for presumption to apply, defendant's negligence must be "the most probable" explanation].)  "[R]es ipsa loquitur will not apply if it is *equally* probable that the" injury was not due to (gross) negligence or that "the [(gross)] negligence was that of someone other than the defendant."  (*Zentz v. Coca Cola Bottling Co. of Fresno* (1952) 39 Cal.2d 436, 443, italics added.)  Here, the record is devoid of evidence—whether from experts or from lay witnesses—that deaths arising in the course of SCUBA dive training are more probably than not the result of negligence (or gross negligence), or that the negligence is more probably than not the negligence of the instructors and dive shop owners.  (See *Crawford v. County of Sacramento* (1966) 239 Cal.App.2d 791, 792-793 [refusing to

---

[8]     This threshold requirement is encapsulated and implemented in the three classic prerequisites to the applicability of res ipsa loquitur—namely, """(1) the [victim's injury] must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) [the injury] must be caused by an agency or instrumentality within the exclusive control of the defendant; [and] (3) [the injury] must not have been due to any voluntary action or contribution on the part of the plaintiff.""" (*Brown, supra,* 4 Cal.4th at pp. 825-826.)

13

apply res ipsa loquitur to presume that patient's death during surgery was due to negligence of anesthetist because "medical testimony neither established nor furnished evidence from which a lay jury could reasonably infer the probability of such negligence"]; *Engelking v. Carlson* (1939) 13 Cal.2d 216, 221-222 [same, due to evidence that victim's injury to peroneal nerve may occur when there is no negligence at all], disapproved of in *Seneris v. Haas* (1955) 45 Cal.2d 811, 827; cf. *Quintal v. Laurel Grove Hospital* (1964) 62 Cal.2d 154, 164 [res ipsa loquitur appropriate where "there was testimony that 90 per cent of the deaths resulting from cardiac arrest occurred by reason of faulty intubation"]; *Cavero*, *supra*, 36 Cal.2d at p. 311 [same, where victim's death during tonsil surgery probably does not occur absent negligence].)

Further, even if we assume that the res ipsa loquitur theory applies, it erects a rebuttable presumption that was conclusively refuted in this case by the undisputed medical testimony that Gallie did not die from any cause connected to defendants' conduct, thereby making JNOV appropriate. (*Casetta*, *supra*, 260 Cal.App.2d at pp. 814-815; cf. *Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 762-763 [res ipsa loquitur appropriate when no evidence rebuts presumption].)

Third, plaintiff argues that the burden of proving causation somehow shifted to defendants because they offered contrary expert testimony regarding causation and because of the newly enacted Evidence Code section 801.1. This argument rests on a misreading of the record and a misunderstanding of the newly enacted provision of the Evidence Code. For starters, defendants did not offer *contrary* testimony on the issue of causation because both Dr. Poukens and Dr. Millington *agreed* that they could not

14

determine Gallie's cause of death. What is more, a defendant's introduction of evidence to undermine or contradict a plaintiff's expert witness on causation does not somehow relieve the plaintiff of her burden of proof on that element; defendants here were not trying to establish an affirmative defense, so plaintiff's citation to cases involving affirmative defenses are irrelevant. (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 469 ["Of course, *at trial*, a defendant raising an affirmative defense has the burden of proving it"].) And Evidence Code section 801.1 premises the admission of testimony by *defense* experts as well as *plaintiff's* experts on a showing of a causal link by a "reasonable medical probability," but "does not preclude" a defense expert from opining that an opinion by a plaintiff's expert about causation was incorrect. (Evid. Code, § 801.1, subds. (a) & (b).) Here, however, *neither* expert opined to any particular cause of death or causal link. So, even if we assume that this newly enacted provision applies retroactively (since it did not take effect until 20 months *after* the trial in this case), Evidence Code section 801.1 is irrelevant.

Fourth and finally, plaintiff argues that the trial court was wrong to overrule "the decision of the jury." But overturning a jury verdict is the whole point of a JNOV motion—namely, to test whether that decision is supported by substantial evidence. Where, as here, it is not, the jury's factually unsupported decision is entitled to no weight. We reject plaintiff's implicit invitation to mandate the denial of all JNOV motions.

\* \* \*

In light of our affirmance of the trial court's order granting JNOV and entering judgment for defendants, the propriety of the

15

court's order granting a new trial is moot. (*In re Coordinated Latex Glove Litigation* (2002) 99 Cal.App.4th 594, 614.)

## DISPOSITION

The judgment for defendants is affirmed. Defendants are entitled to their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

16