[Civ. No. 14776. First Dist., Div. Two. Mar. 3, 1953.]

JOSEPH H. COSTA, Appellant, v. REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Respondents.

Ernest I. Spiegl and Belli, Ashe & Pinney for Appellant.

Dana, Bledsoe & Smith for Respondents.

NOURSE, P. J.—This cause was before us on a prior occasion in which we entered judgment of affirmance (Cal.App.) 247 P.2d 21. Thereafter the Supreme Court filed its opinion in *Zentz* v. *Coca Cola Bottling Co.,* 39 Cal.2d 436 [247 P.2d 344], treating the subject of the res ipsa loquitur doctrine. For that reason this court granted a rehearing for the express

purpose of having further argument on the question of the application of that doctrine to this case.

In a reexamination of the record in the light of the Zentz case we are satisfied that the judgment must be reversed on that ground. All the other points raised have been properly treated in the former opinion which we now quote omitting the matter therein relating to res ipsa loquitur doctrine.

"Appellant brought a malpractice suit against the Regents of the University of California in whose University of California Hospital in San Francisco, herein further called University of California Hospital, he received treatment and also against five individual defendants. His action against three of the individual defendants was nonsuited; they are not parties to this appeal. The case against the Regents and against Bertram V. A. Low-Beer and Nathan Spishakoff, two of the physicians who treated him, was tried to a jury which failed to arrive at a verdict and was discharged. On the motion of said defendants, whose motion for a directed verdict had been denied, judgment was entered in their favor under section 630, Code of Civil Procedure, and plaintiff appeals. The court held that said appeal was timely filed. *Costa* v. *Regents of University of Calif.*, 103 Cal.App.2d 491, 495 [229 P.2d 867].

"Plaintiff, a seasonal cannery worker living at Monterey, California, permanently partially disabled by a spinal injury received in the Army, on July 16, 1945, consulted a local physician, Dr. Gorham, about a sore on his tongue which he said he had had for three or four months. On July 27th a biopsy was taken and on August 1, 1945, the report received that it was an epidermoid carcinoma. Dr. Gorham arranged for him to go to the outpatient department of the University of California Hospital for treatment. Plaintiff was first seen at the hospital on August 22, 1945, and it was found that, over and above the primary lesion under the tongue, nodes or a nodular mass under the chin were involved either by metastasis or direct extension. X-ray treatment was decided upon to be followed by operation on the neck after the primary lesion would be controlled. Plaintiff received the X-ray treatment as an outpatient in the Department of Radiology of which defendant Dr. Low-Beer was the head and defendant Dr. Spishakoff was an assistant. After, on the request of said department, six lower front teeth of plaintiff had been

extracted in the Department of Dental Surgery, the intra-oral X-ray treatment started on August 27, 1945. From that date until September 21, 1945, plaintiff received 8 intraoral treatments followed by 12 submental treatments (treatments from the outside under the chin). The treatments caused burning of the skin of the neck and inflammation of the mucous membrane of the mouth, which healed during October, 1945. At the end of the X-ray treatment plaintiff, who had during the treatment taken temporary living quarters in San Francisco, returned to Monterey and came up from there to the University of California Hospital from time to time in accordance with appointments made. On November 23, 1945, plaintiff was put on the waiting list for neck surgery but the transfer record in relation to it was misplaced for six months and plaintiff not notified that the operation could take place until May, 1946, at which time plaintiff declined in accordance with the advice of defendant Low-Beer that the operation was no longer necessary. In the meantime the lesion, which had been regularly followed in the Radiology Department, had healed satisfactorily without signs of re-currence or metastasis. However in the middle of January, 1946, there had developed pain in plaintiff's teeth and a sinus in his gum which, after the taking of X-ray pictures which did not show appreciable bony involvement, was diag-nosed as probably an early radiation necrosis, which had to be watched. For the moment only penicillin lozenges were prescribed. When plaintiff was seen on March 8, 1946, the necrotic area in the gum had increased. After consultation with a doctor of the Dental Department and the president of the Visible Tumor Clinic an attitude of further watching and waiting, with mouth hygiene to be given by the dental clinic, was decided upon. During April, May and June, 1946, plaintiff was well enough to resume his work as a cannery worker. In May he wrote a letter to defendant Dr. Spishakoff that he felt O. K. except for some sore teeth. He quit work again in June, 1946, and testified that he did so because of the deteriorating condition in his mouth. On June 16, 1946, plaintiff when seen by defendant Low-Beer believed that the area of necrosis on the lower alveolar ridge had become some-what larger but on June 25 a slight improvement was found and on July 9 and August 26, 1946, little or no change in the necrotic areas was noted. In a letter to whom it may concern given by Dr. Hill, an assistant in the Department of Radiology to plaintiff on the last mentioned date, the statement

was made that plaintiff at that time had areas of osteoradio necrosis of the lower jaw. An appointment was made for plaintiff to return in four weeks for the taking of films of the jaw, but plaintiff returned on December 10, 1946, at which time the exposed areas of the mandible were found to have considerably extended. X-rays of the mandible were taken the same day to determine the extent of the involvement and an appointment made for plaintiff to come back in a month. The roentgenologist's report could not decide whether the lesion shown was caused by osteoradio necrosis or infiltration of carcinoma and advised further study. However in the beginning of January, 1947, painful swelling under the chin and pain in the lower jaw developed which new development was reported to Dr. Low-Beer by plaintiff's landlady, later his wife, in a letter dated January 3, 1947. When defendant Low-Beer saw plaintiff on January 8, 1947, he thought it looked like osteomyelitis. Further X-ray films were ordered and the patient presented in the Visible Tumor conference. It was decided that plaintiff, as treatment for acute osteomyelitis, required hospitalization, systemic penicillin treatment and mouth hygiene but no surgical intervention at that time. However plaintiff was told that no bed was available for him at the University of California Hospital but that steps could be taken for his hospitalization in the city and county hospital. Plaintiff preferred under those circumstances to be hospitalized nearer to his home and he stated his desire to be treated in the Peninsula Community Hospital at Carmel by Dr. Swengel. Accordingly defendant Low-Beer wrote under date of January 10, 1947, a letter to Dr. Swengel describing in detail diagnosis and treatment of the cancer in 1945, the appearance and treatment of breakdown of alveolar mucosa and laying free of the bone in the alveolar region in 1946 and the recent appearance of acute osteomyelitis with as advised treatment: 'Hospitalization of patient, systemic penicillin, and mouth hygiene, and no surgical intervention at the present time.' The letter was given to plaintiff sealed (his landlady had requested that plaintiff should be kept unaware of the malignant character of his illness, which attitude was expressly approved by plaintiff in these proceedings) and was handed over by him to Dr. Swengel without having been read by plaintiff. It was stipulated when the letter was received in evidence that the letter could not prove knowledge of its content by plaintiff. Before plaintiff left for Monterey an appointment was made for him to come

back after the hospital treatment. He was hospitalized the same day (January 10, 1947,) in the Peninsula Community Hospital at Carmel, treated by Dr. Swengel with systemic penicillin, mouth hygiene and anodyns and discharged on January 22, 1947, as improved. He left the hospital on foot. His temperature was normal after having been somewhat too high the first two days of the hospitalization. Plaintiff did not return as a patient to the University of California Hospital and defendants thereafter. He remained in Monterey under treatment of Dr. Swengel who discontinued the systemic penicillin treatment and also consulted once a Dr. Cleves, a general practitioner, who advised him to spray his mouth with penicillin. During the year 1947 plaintiff's condition deteriorated greatly. When on December 22 of that year he was admitted as a veteran to the United States Naval Hospital at Oak Knoll he had developed large collar-like submandular masses with fistulas draining to the outside, a large exposed area of the mandible was necrotic, the mouth in a foul condition, his general condition emaciated from poor nutrition due to inability to eat because of the infection of the mandible. He was treated for radiation necrosis, osteomyelitis and the general condition described with systemic penicillin, sulfadiazine, opening of the draining areas under the mandible, mouth hygiene, vitamines intramuscular, calcium tablets and special diet. A splint in the mouth to cover the denuded bone was tried but plaintiff could not continue to wear it because of the tenderness of the gums. Plaintiff's general condition improved and in January, 1948, he was able again to be out of bed, but the osteomyelitis extended backward toward the throat, and the necrotic mandible fractured for which reasons on January 29, 1948, the diseased portion of the mandible was excised from the molar region on the left to the area between the first and second molars on the right. Further surgery was necessary because of recurrence of osteomyelitis. Although plaintiff was sent home sometimes for periods to gather strength he had to return for further treatment and closing of the fistulas until he was discharged on July 20, 1948.

"This action was instituted on November 5, 1948. The complaint is in two counts. The first count alleges in substance that defendants, who treated plaintiff as a paying outpatient, had been so negligent in the diagnosis and treatment of the growth on his tongue as to cause destruction of fleshy and bony tissue of the mandible, not involved in

the illness to be cured; that defendants assured plaintiff that such symptoms were a normal result of the treatment given and would clear up within a reasonable time; that when the symptoms grew worse on January 10, 1947, they refused to admit plaintiff as a paying bed patient and reiterated said assurances and told plaintiff that he should not permit surgical treatment of the mandible by other physicians. That until December, 1947, he received conservative treatment by other physicians who also assured plaintiff that the affected tissue would eventually heal without any permanent injury; that however his condition deteriorated until in December, 1947, he was accepted as a patient in the United States Naval Hospital, Oakland, where in January, 1948, he heard for the first time that during the treatment by defendants plaintiff's mandible had been severely burned, and that because of its vulnerable and denuded condition osteomyelitis in the mandible had set in; that over and above the negligence in the original treatment defendants were negligent in not earlier (in the middle of 1946) diagnosing and treating the osteomyelitis so as to prevent the serious consequences which now existed. The second count of the complaint adds to the above allegations the contention that defendants to conceal the true facts concerning their negligence knowingly and fraudulently misinformed · plaintiff concerning the character and prospects of his later affliction and refused to plaintiff's later physicians and surgeons information concerning medical history and treatment of plaintiff's case. Defendants denied the material allegations of the complaint and as affirmative defenses pleaded contributory negligence of plaintiff and the bar of the statute of limitations. There is no contention that plaintiff's alleged contributory negligence would as a matter of law justify taking the case from the jury; however defendants urge that the bar of the statute had that effect and that moreover no substantial evidence of negligence had been adduced. They point out that written information given by defendants and other assistants at University of California Hospital concerning plaintiff's case history and treatment, to wit, the stated letters of January 10, 1947, to Dr. Swengel and of August 26, 1947, to whom it may concern negative any intent of fraudulent concealment, that there is no evidence whatever that defendants' representations to plaintiff, if any, were made fraudulently contrary to their better knowledge, for the purpose of concealment, that the statute started running according to the normal rule on January

10, 1947, the last day on which plaintiff presented himself for treatment by defendants and the action was therefore barred on January 10, 1948.

"Even if it be conceded that the relation of physician and patient between plaintiff and defendants ended when in January, 1947, notwithstanding an appointment made plaintiff did not present himself anymore for treatment after he had left the hospital at Carmel improved and ambulant, and that there was no substantial evidence of fraudulent concealment sufficient to go to a jury, since defendants before showing reluctance to give information to Lieutenant Commander Madden of Oak Knoll Hospital had given full information in writing concerning plaintiff's treatment and case history in the letters mentioned, nevertheless plaintiff's action was not barred as a matter of law.

�In "'It is the settled law in this state that an action by a patient against a physician and surgeon for injuries sustained by the former, by reason of the negligent or unskilled treatment of the latter, is an action sounding in tort and not upon a contract. Such an action is therefore barred by the provisions of subdivision 3 of section 340 of the Code of Civil Procedure one year after the date of the injury.' Although this general statement was made in *Huysman* v. *Kirsch*, 6 Cal.2d 302, 306 [57 P.2d 908], this same leading case modified and liberalized this rule among other means by applying to the malpractice case the principle of workmen's compensation law 'that the statute of limitations should not run against an injured employee's right to compensation during the time said person was in ignorance of the cause of his disability and could not with reasonable care and diligence ascertain such cause.' 6 Cal.2d at pages 312-313, 57 P.2d at page 913. ▎ Since that decision the rule is settled in this state that in malpractice cases the statute cited does not start to run until the date of discovery, or the date when, by the exercise of reasonable care plaintiff should have discovered the wrongful injury. *Greninger* v. *Fischer*, 81 Cal.App.2d 549, 553 [184 P.2d 694]. Although *Huysman* v. *Kirsch* and some of the cases following it related to foreign substances negligently left by the defendant in the body of the patient, the rule is not restricted to such cases. See *Greninger* v. *Fischer*, *supra*, relating to negligence in diagnosis and treatment of an injury and *Agnew* v. *Larson*, 82 Cal.App.2d 176 [185 P.2d 851], applying the rule to negligence in prescribing dangerous medicine. In *Airola*

v. *Gorham,* 56 Cal.App.2d 42, 46 [133 P.2d 78], this court quoted the rule of *Huysman* v. *Kirsch* even as an example of a broader principle applicable also outside the field of malpractice. ■ As in compensation cases, *Pacific Indem. Co.* v. *Industrial Acc. Com.,* 34 Cal.2d 726, 729 [214 P.2d 530], the issues when the plaintiff discovered his injury and its actionable origin, or should have discovered them by the exercise of reasonable care are questions for the trier of facts.

■ "In this case the testimony of plaintiff, that he relied on statements of defendants and of Dr. Swengel and a dentist Hart that his symptoms were a normal result of the treatments, that they would clear up in course of time and that he should not permit surgical treatment of his jaw, that he did not know the exact meaning of the technical terms used by defendants concerning his illness and that only after the operation in Oak Knoll Hospital he learned the true character and cause of the injury to his chin, part of which testimony was corroborated by plaintiff's wife, was sufficiently substantial evidence as to the delay in discovery to make these issues questions for the jury.

. ■ . . . . . . . . . . .

■ "Appellant next argues at great length that also without application of the res ipsa loquitur doctrine there was evidence of negligence that should have gone to the jury. He divides his contentions in this respect into 15 specifications. It will not be necessary to treat each specification separately. They form three distinct groups: the first six specifications relate to the X-ray treatment itself, its allegedly too drastic and extensive character, insufficient use of protective devices and precautions, faulty methods of application and failure to use available diagnostic procedures to obtain certainty whether the extension of the lesion necessitated such drastic treatment. We do not find any substantial expert evidence supporting any of this group of specifications. To the contrary there is much expert testimony that the treatment as given was in accordance with good standard procedure, and that decisions complained of were matters of choice and stayed within the limits of sound medical judgment. Appellant mainly relies on the testimony of Dr. Bell of the Department of Surgery of University of California Hospital and Lieutenant Commander Madden, dentist and oral surgeon, who treated appellant at Oak Knoll Hospital. Dr. Bell, who saw the patient only after the X-ray treat-

ment had been terminated, advised an operation to remove the lymph nodes of the neck, which were enlarged apparently in relation with the cancer. He testified that it was the ordinary procedure to treat the original lesion by radiation and to treat enlarged nodes surgically. Appellant seeks to conclude from this evidence that X-ray treatment of the submental nodes was unnecessary and that therefore the external X-ray treatment could have been avoided. Neither Dr. Bell nor any other expert so testified. To the contrary the testimony of defendant Dr. Low-Beer, supported by testimony of other experts not parties to the action, was that for the killing *of the original lesion* 'sandwich' treatment intraorally and externally from different directions was the best procedure. Dr. Bell did not express any opinion as to the desirability of the X-ray treatment given, but, as a surgeon, testified to the desirability of certain surgical treatment over and above the X-ray treatment. His testimony would have been important if the basis of the action had been recurrence of the cancer because of failure to remove the nodes surgically. However, fortunately, there was no recurrence. As support of appellant's contention that the X-ray treatment was too extensive Dr. Bell's testimony is without value.

"Dr. Madden testified that it was the general practice to use a lead shield or mask to protect the mandibular area as much as possible during X-ray treatment of a cancer of the tongue, and that a mask could be built in an hypothetical situation taken from this case. However he also testified that he was not an expert on X-ray treatment and that he only made the masks which the X-ray operator desired. Several experts on X-ray treatment testified that in the case before us it was not advisable to mask the mandible because it would impede the irradiation of the parts where irradiation was necessary. The testimony of Dr. Madden does not cause a substantial conflict with said evidence because he evidently only intended to express an opinion about the desirability of the use of shields and masks in general and the technical possibility of making them in cases like the one here involved, but not on the question whether in this special case the use of such devices would have had an injurious effect on the treatment, a subject as to which he expressly denied expert knowledge. Neither his nor any other expert testimony in the case could be a basis for a jury to find negligence because of failure to shield or mask.

"There is much discussion of the evidence with respect

to the exact location and extent of the cancer, because appellant argues that if the evidence pointing to the least dangerous location and the smallest size is believed a less drastic and extensive treatment would have sufficed. Although there may be some conflict in the evidence as to this point we need not go into detail. The expert evidence showed clearly that the exact extent of the cancer under the surface and the absence of hidden involvements cannot in a case like appellant's be decided with such certainty that it can be safely relied on for the purpose of restricting the treatment within narrow limits. There was no expert evidence whatever that on the data available to defendants they ought in good practice to have restricted the X-ray treatment to a less drastic procedure or that the diagnostic methods now indicated by appellant if used would have yielded certainty and should have led to restriction to less dangerous treatment. Several experts testified that said methods (X-ray pictures and biopsy) could not be relied on for the purpose. In fighting so dangerous a condition as here involved, physicians may take serious risks and in doing so must rely on their judgment in deciding how far to go. See *Callahan* v. *Hahnemann Hospital*, 1 Cal.2d 447 [35 P.2d 536]. To hold them responsible in the cases where the bad chance unfortunately materializes would be evidently unjust and most dangerous if physicians were deterred from going to the extent which gives their patient the best chance of survival.

''We need not detail the further specifications of this group as there is with respect to them neither evidence that they constituted bad practice nor that the procedures specified may have caused or contributed to the development of osteonecrosis and osteomyelitis.

''The second group of seven specifications relates to the treatment of radio necrosis and osteomyelitis which developed during 1946-1947. Appellant assigns as negligence among other things that defendants did not use dentures and tube feeding to protect the necrotic areas and prevent osteomyelitis infection, that when osteomyelitis developed it was not timely diagnosed, that no diagnostic methods were used to find osteomyelitis although appellant's deteriorating condition and the presence of osteonecrosis required them and that the osteomyelitis was treated insufficiently and too late.

''With respect to this second group of specifications appellant favorably compares the treatment given in Oak Knoll Hospital with the treatment given by defendants. The com-

parison is without any value. In the first place 'the fact that another physician or surgeon might have elected to treat the case differently or use methods other than those employed by defendant does not of itself establish negligence,' *Lawless* v. *Calaway*, 24 Cal.2d 81, 87 [147 P.2d 604, 607]. But moreover in this case there was no resemblance whatever between the conditions during the period when defendants treated appellant's radio necrosis and when he was a patient at Oak Knoll Hospital. The treatment of defendants ended in the first part of January, 1947, just at the time when they themselves made the diagnosis of acute osteomyelitis and declared a more intensive treatment including systemic penicillin necessary. Said treatment given immediately in the Monterey Hospital proved effective for the moment. For the treatment after that time until appellant reached Oak Knoll Hospital in the unfortunate condition previously described, a treatment which covered nearly the whole year 1947, defendants are in no way responsible, as during that time appellant chose to be treated by others (general practitioners).

''This second group of specifications relates therefore only to the period from the middle of 1946, when according to the complaint defendants should have diagnosed the osteomyelitis, and the beginning of January, 1947. Although there were earlier symptoms of soft tissue necrosis the first mention of osteo radio necrosis which may be a danger sign for osteomyelitis is in the letter of Dr. Hill of August 26, 1946. There is no evidence of any knowledge of defendants prior to January, 1947, of complaints of a more generalized nature or of outside redness or swelling comparable to those existing at the end of 1947. No mention of such is made in the records of the University of California Hospital and appellant who testified at length in his own behalf did not testify that he complained of such conditions to defendants. All his complaints relate locally to his mouth. His wife testified to his illness and keeping his bed in the fall of 1946 but not to reporting of these circumstances to defendants before her letter of January 3, 1947; that letter mentions swelling under the chin. There is no record or evidence of any visit of plaintiff to the University of California Hospital between August 26, 1946, and December 10, 1946, or of any report sent to defendants during that period concerning plaintiff's condition. It is then evidently useless to compare appellant's treatment in the second half of 1946 when he was treated by

defendants as an irregularly reporting ambulant outpatient with a beginning osteo radio necrosis and his treatment at the end of 1947 when he was received in Oak Knoll Hospital as a bed patient with a far progressed acute osteomyelitis and a general condition exhausted by malnutrition and illness.

"Appellant relies on the testimony of Dr. Newell, called as an expert by defendants, to the effect that from the first appearance of radio necrosis of the mandible osteomyelitis should always be suspected. However said expert also testified that in common practice systemic penicillin is used when the patient develops a fever and increased white cells in his blood and becomes ill with a bad feeling indicating absorption of poison in the system and that it is good practice to take temperature and blood count when he begins feeling badly. Other expert witnesses also testified that it is only common practice to give systemic penicillin injections for osteomyelitis when the patient is febrile and toxic from a generalized infection or when at least there was redness and swelling in the area indicating infection; whether there are indications of an infection is mostly a matter of judgment for the physician who is treating the patient at the time. Lieutenant Commander Madden testified that in the condition in which appellant came to Oak Knoll accepted practice was to give penicillin and/or sulfa drugs and that also in a hypothetical case combining plaintiff's symptoms on December 10, 1946, and January 8, 1947, systemic use of penicillin or other antibiotic was standard practice, but he also testified that the treatment was a matter of judgment for the attending doctors. This evidence cannot prove any negligence of defendants. There is no evidence of any circumstances brought to their knowledge before January, 1947, which indicated a general toxic condition or other infection which required according to common practice treatment not given or the need of taking temperature or blood count. The testimony of Dr. Madden has no relevancy for this early period. On January 10, 1947, defendants gave the same advice as held good practice by him and at that time their function ended. There is no expert evidence either that common practice required the taking of more X-ray pictures than were taken or that the taking of more pictures would have led to earlier diagnosis or other treatment. X-ray pictures would have been taken earlier if appellant had kept the appointment made for that purpose on August 26, 1946. The pictures taken on December 10, 1946 proved inconclusive according to a report made on them

after plaintiff had again left for Monterey. There is no expert evidence that circumstances then existing showed that this further study could not wait until the new appointment made for a month later. When the letter of January 3, 1947, showed an exacerbation of the condition a new appointment was immediately given and more pictures made.

"The same applies to the complaints of insufficient protection against infection.

"Although Dr. Madden testified that in Oak Knoll Hospital he gave appellant a necrellic splint to cover the denuded bone and to keep food from going into the exposed area (the hospital record shows that appellant could not continue to wear it) there is no evidence that such was standard practice in the earlier stages of necrosis or at all or that it was negligence not to give it. The same applies to the tube feeding which Dr. Madden only prescribed for the initial stage in Oak Knoll Hospital (1947-1948) when the inflammation made it hard for appellant to swallow. There is no evidence that in 1946 when defendants were treating him his condition was such that tube feeding was a procedure necessarily required by good practice.

"The other specifications in this group are wholly without merit. From the failure to hospitalize appellant between November, 1945, and May, 1946, when the hospitalization was planned for neck surgery, no detrimental results have appeared and there is no connection whatever with the treatment of the osteonecrosis. There is no evidence that it is common practice to have osteomyelitis of the jaw treated by orthopedists. Dr. Madden testified that such cases were sent to an oral surgeon; at University of California Hospital the Dental Department was consulted and gave plaintiff mouth hygiene. Neither is there evidence that in 1946 appellant needed the same diet as when he was hospitalized in Oak Knoll Hospital and that for his condition in 1946 the prescription of milk by defendants was not sufficient according to common practice.

"In the last place appellant predicates negligence on two unrelated specifications equally without merit. The refusal to hospitalize appellant in January, 1947, because no bed was available although defendants declared that hospitalization was necessary cannot constitute negligence because there is no duty, contractual or otherwise for a university hospital to hospitalize persons with whom they have only contracted for outpatient's services, and certainly no duty

to have beds available for them whenever they may need them. ▉ The allegedly negligent handling of defendants' hospital records which according to appellant made them unreliable concededly had not been a proximate cause of the injury for which the action was brought.

▉ "Appellant contends that if each separate specification were insufficient as basis of a negligence verdict the combination of all fifteen would at any rate suffice. That is not so. When there is here no evidence of negligence as to any of the fifteen points, there is no evidence to go to the jury with respect to their combination either.

"Appellant's further designations of error relate to rulings of the court on the admission of evidence.

▉ ."In the first place it is contended that the court erroneously sustained objections to questions of appellant directed to expert witnesses whether the condition of necrosis and secondary osteomyelitis which plaintiff suffered did not ordinarily follow treatment for cancer as here involved. An offer of proof to the effect that it does not was made and the relevancy argued on the ground that if this were established the doctrine of res ipsa loquitur would apply. The court correctly held that such, even if proved, would not make that doctrine applicable. The result of the same treatment is not always the same in all cases and on all patients. When the result of a treatment is less favorable or more prejudicial than in the great majority of cases such need not indicate that the treatment was negligently performed, but may as well be the result of individual differences in reaction or the less favorable circumstances of the case. . . .

"Next appellant contends that the court erred in limiting the examination of the defendant Dr. Bell in a manner held reversible error in *Lawless* v. *Calaway, supra,* 24 Cal.2d 81 [147 P.2d 604]. ▉ In that case it was held, 24 Cal.2d at page 90 et seq., 147 P.2d 604, that the right to elicit testimony from an adversary under section 2055 should be liberally construed and that any relevant matter in issue in a case is within its scope. ▉ It also comprises the standard of skill and care ordinarily exercised under like circumstances and the question whether defendant's conduct conformed thereto, even though such examination calls for expert testimony. It is true that the court in discussing the manner of examination of Dr. Bell used expressions which might indicate that he was not fully aware of the above rule. However

a careful examination of the parts of the transcript indicated by appellant shows that the court's interference did not actually cause an undue or prejudicial restriction. The first example given by appellant related to the question asked Dr. Bell whether he knew why the neck operation was not performed. An objection was sustained on the ground that the reason was immaterial. Appellant's attorney pointed out as only ground of materiality that he was going to an issue brought out by defense counsel in his opening statement. The court then ruled in substance that it was not the proper time for rebuttal of intended evidence, but that appellant could meet the evidence when it was put in. ▌ The order of proof is in the sound discretion of the court. Section 2042, Code of Civil Procedure, 24 California Jurisprudence 764 and cases there cited. ▌ If the question would have been material on another ground, as is argued now, but which was not stated in the court below, the point cannot be reviewed on appeal. *Valentin* v. *Valentin,* 93 Cal.App.2d 588, 593 [209 P.2d 654]; *Estate of Parkinson,* 190 Cal. 475, 477 [213 P. 259]. Moreover in the light of all the evidence now received the question was immaterial and appellant in no way prejudiced.

▌ ''Appellant next complains that he was restricted in eliciting from Dr. Bell an unequivocal definition of the medical significance of the word 'apparently' in the following phrase contained in the hospital record of the plaintiff's first examination in the surgical department: 'It (the lesion) does not apparently involve the gum margin.' The court stated: 'I don't think ''apparently'' is a medical term. ''Apparently'' means from appearance; is that what you construe it, Doctor? A. That's right.' No objection was sustained or offer of proof made, and the examination of Dr. Bell continued as to the standard procedure if it were suspected that something was involved other than that which was apparent. Moreover immediately thereafter the answer was elicited that the writer meant that there was no evidence of bony involvement. In fact no restriction and therefore no prejudice appears.

''The third example stated relates to questioning of Dr. Bell concerning the distance of the lesion from the gum line as shown in a small sketch made in the record. The witness gave answers indicating that he did not know it for this special case and could not say it with certainty. To the question whether there were other statements in the record which gave more certainty an objection was sustained informally on the

ground that the record was the best evidence. ▮ Appellant's argument that the jury needed expert explanation of the medical language of the record is rebutted by his own statement that he wished to bring out that there were no such statements in the record. The matter seems without importance or prejudice.

▮ "At the next point cited appellant stated his intention to ask questions relating to parts of the record and began to point out a portion and to comment on it, to which commenting defendants objected. The court then invited appellant to state the question based on the record which the witness had in front of him. The questions which appellant then asked were not based on the record at all but only asked for definitions of osteomyelitis and osteo radio necrosis which were given. The questions proved to be introductory to an inquiry whether when symptoms of necrosis followed by osteomyelitis were present the patient should properly be referred to an orthopedic surgeon. The answer elicited was that it depended on the location and that if it was in the mandible it should probably not be done. There is no indication whatever of any prejudice by any possible restriction of reference to the record.

"When cross-examining the defendant Spishakoff who had testified for the defense after plaintiff had rested and had stated that he had not seen the plaintiff after March 8, 1946, and that up to that time he saw no occasion for taking temperature or making other routine checks appellant asked whether in his judgment, if there would have been moreover a red and swollen area outside, a symptom which occurred later, there would have been occasion to make such a check. Objection was sustained on the ground that it was not cross-examination. Although under the rule of *Lawless* v. *Calaway, supra,* the question would probably have been admissible under section 2055, Code of Civil Procedure, as part of plaintiff's case or on rebuttal there may be doubt whether it ought to be injected into the cross-examination on defendants' case. However we need not decide the point. ▮ Just prior to the objection stated the witness had already answered without objection that clinical signs of infection like redness in the area or swelling would be the occasion for such check. The answer was what plaintiff wished to bring out and he cannot be prejudiced by the prevention of repetition.

▮ "An objection to the question put to defendant Low-Beer to name another of his patients that had a similar result

was correctly sustained on the ground that the name was immaterial and would violate the confidence between the physician and said patient.

"An assignment of error not relating to examination of a defendant follows. After the expert Dr. Shimkin had testified that calcium, vitamins and so forth would do no particular good so long as the patient was ambulatory, was taking nourishment by mouth, and has maintained his weight, plaintiff inquired into the meaning of 'ambulatory.' The witness testified that it was determined by his ability to stay on his feet and to come to the clinic at intervals on his feet. To the question whether that would also be the case when he came with the help of somebody else, in an automobile, although needing to be in bed, the court objected on his own motion without stating a reason and took the noon recess. The court evidently objected to undue prolongation of the very extensive cross-examination by unimportant details. Appellant did not make any showing of materiality. Although we do not think that the question was actually objectionable no sufficiently substantial prejudice by the exclusion is shown or appears to us to justify reversal.

"Next appellant assigns as error the sustaining of an objection of immateriality to the question asked defendant Dr. Bell, whether textbooks are used in teaching the doctors at University of California Hospital in the subjects being mentioned in the examination of the witness. Appellant explains on appeal that the question was intended to lay the foundation for quotation of statements which counsel knew were in textbooks used by the defendants. The question which evidently is prima facie immaterial was not explained at the trial in this or any other manner. Thus the sustaining of the objection was no error. The point argued by appellant whether it would be objectionable to ask an expert witness who is a teacher which books he uses in teaching the subject involved in his testimony is not before us.

"Finally appellant assigns as prejudicial error miscellaneous rulings and remarks of the court too numerous to allow statement of each separately. We have checked all and concluded that each was either not erroneous or not prejudicial."

In our former opinion it is stressed that the res ipsa loquitur doctrine is based on common knowledge and that it only applies in malpractice cases "where a layman is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as

ordinarily would have followed if due care had been exercised," citing *Engelking* v. *Carlson*, 13 Cal.2d 216, 221 [88 P.2d 695]. ■ However, in the Zentz case it is said that the doctrine is based on the probability that the injury is the result of negligence and continues: "In determining whether such a probability exists with regard to a particular occurrence, the courts have relied both upon common knowledge and the testimony of expert witnesses." (At p. 453, citing as authority, among others, *Cavero* v. *Franklin etc. Benev. Soc.*, 36 Cal.2d 301, 309 [223 P.2d 471], a malpractice case.) ■ And again on the same page: ". . . it must appear, either as a matter of common experience or from evidence in the case, that the accident is of a type which probably would not happen unless someone was negligent." Although there is here a clear difference in theory, the difference is without practical importance so far as the evidence in the record is concerned, as there is no substantial expert testimony that results such as here ensued are probably caused by negligence. However, appellant contends also, that he tried to elicit from the experts for defendants evidence to that effect but was prevented by the court. When plaintiff asked one of the medical witnesses whether he had seen such bad results of similar treatment in cases in which the witness had taken part and plaintiff explained that he was attempting to place the case within the res ipsa rule, the court sustained an objection saying that plaintiff could put the doctrine aside entirely, that he was not going to instruct upon it, that it was a case for experts not for ordinary people and that in that condition the doctrine did not apply.

■ In view of the sweeping ruling of the trial judge excluding all expert evidence in support of the theory of res ipsa loquitur no offer of proof by appellant was necessary. ■ "Where, however, an entire class of evidence has been declared inadmissible or the trial court has clearly intimated that it will receive no evidence of a particular type or class, or upon a particular issue, an offer of proof is not a prerequisite to arguing on appeal the prejudicial nature of the exclusion of such evidence." (*Lawless* v. *Calaway*, 24 Cal.2d 81, 91 [147 P.2d 604] ; *Tomaier* v. *Tomaier*, 23 Cal.2d 754, 760 [146 P.2d 905] ; *Caminetti* v. *Pacific Mut. Life Ins. Co.*, 23 Cal.2d 94, 100 [142 P.2d 741].) ■ As to the particular question asked on cross-examination no offer of proof was required for the further reason that cross-examination being exploratory it is unreasonable to require the cross-examiner to make an offer

of proof. (*Tossman* v. *Newman,* 37 Cal.2d 522, 525-526 [233 P.2d 1]; *Lawless* v. *Calaway, supra,* 24 Cal.2d p. 91.) This error of the trial court denying appellant the right to produce expert evidence in support of the res ipsa theory necessitates a reversal.

Judgment reversed.

Goodell, J., and Dooling, J., concurred.

A petition for a rehearing was denied April 2, 1953, and respondents' petition for a hearing by the Supreme Court was denied April 30, 1953. Edmonds, J., was of the opinion that the petition should be granted.