[Civ. No. 19121. Second Dist., Div. Three. Sept. 8, 1953.]

HOWARD W. BOWERS, Appellant, v. ISAAC Y. OLCH, M.D., et al., Respondents.

Morris Lavine for Appellant.

Clarence Hansen, as Amicus Curiae on behalf of Appellant.

De Forrest Home, Schell, Delamar & Loring, Loeb & Loeb and John L. Cole for Respondents.

WOOD (Parker), J.—Action against three surgeons, a hospital, and the supervisor of the operating rooms for damages resulting from alleged negligence during a surgical operation. Trial was by jury. Motions for nonsuit were granted as to the second assistant surgeon (who was the resident surgeon of the hospital), the hospital, and the nurse. Judgment of nonsuit was entered pursuant thereto. Verdicts were in favor of the principal surgeon and the first assistant surgeon, and judgment was entered pursuant thereto. Plaintiff appeals from the judgment of nonsuit and the judgment based upon the verdict. He contends that the verdict was contrary to the evidence; that the court erred in granting the motions for nonsuit, in admitting and excluding certain evidence, in instructing the jury, and in refusing to allow an amendment to the complaint.

On June 25, 1946, Dr. Isaac Y. Olch, who was employed and paid by plaintiff, performed an operation upon plaintiff at the Cedars of Lebanon Hospital and removed about three-fourths of plaintiff's stomach. Dr. Alex Shulman, who was employed and paid by Dr. Olch, assisted in the operation as the first assistant surgeon. Dr. Morris Freiden, who was employed and paid by the Cedars of Lebanon Hospital as surgical resident, assisted in the operation as the second assistant surgeon. Helen Pearson, who was a registered nurse and the administrative supervisor of the nine operating rooms of the hospital, assigned two nurses to attend the operation, and they were in the operating room during the operation. Miss Pearson was not in the operating room.

About April 1, 1950, plaintiff who had had recent attacks of fever and had enlarged lymph glands under his jaw and arms, was examined by Dr. Simkin at the Midway Hospital in Los Angeles. The examination showed tenderness particularly in the stomach along the right rib margin. X rays of plaintiff, taken in that hospital on April 7, 1950, showed a curved surgical needle within the soft tissues of the left upper quadrant (of the abdomen) below the rib margin. Dr. Simkin did not tell plaintiff that the X rays showed a needle. (That

doctor testified that the wife of plaintiff, who is a nurse, saw those X rays on April 7th. On April 8th Dr. Simkin discussed the matter of the needle with Dr. Olch and sent the X rays to him. About April 16, 1950, plaintiff heard for the first time that a needle was in his abdomen—he heard a technician at the Midway Hospital say that an X ray showed a needle in the plaintiff's stomach. Appellant went to Dr. Olch's office on April 20th and Dr. Olch showed him the X ray and told him that it was not necessary to remove the needle since it was undoubtedly encased in scar tissue, but if he wanted it removed it could be removed without cost to him. Plaintiff declined that offer and went to see Dr. Furnish. (On April 25th plaintiff and Dr. Simkin discussed the matter of the needle.) On July 14, 1950, Dr. Furnish operated upon plaintiff, in the presence of Drs. Olch, Shulman and Freiden, and removed the needle. It took about four hours to perform the operation—the needle was in the splenic flexure of the large intestine in a band of fibrous tissue or adhesions, which band was about 2 inches long and 1 inch thick. In working the needle loose (in the adhesions) it broke in two.

 Appellant contends that the court erred in permitting Dr. Olch to give his opinion as to how the needle got into appellant's body. He (appellant) argues that the opinion was based upon surmise, conjecture and speculation and that such an opinion cannot be used to rebut the inference of negligence which arose under the doctrine of res ipsa loquitur. The needle was left in appellant's abdomen during the operation by Dr. Olch in 1946. Dr. Olch testified that he did not know how the needle got into appellant's abdomen; that in his opinion he did not leave the needle there; that he had no specific independent recollection of the operation in 1946. Counsel (Mr. Home) for Drs. Olch, Shulman and Freiden asked Dr. Olch as follows: "Do you have an opinion as to how the needle in this case got into the body of Mr. Bowers?" Dr. Olch answered: "Yes, I do. It got in in one of two ways, in my opinion." Thereupon counsel for appellant said: "I object to this. It is a question for the jury to determine. It is incompetent, irrelevant and immaterial." The judge said: "I don't know how the jury is going to get inside that incision and see how it got there unless somebody tells them." The objection was overruled, and Dr. Olch testified: "These laparotomy pads are put up in packages of six. They are put up in these packages in the supply room of the operating suite. We have an operating suite of nine

rooms, nine operating rooms. We must have around 50 nurses and trained attendants who prepared these pads. The pads are done just like this, the rings folded inside. They are piled in sixes and either tied with string or wrapped together and then sterilized. All this goes on at this large table where all the nurses and attendants work at it and do these things. Now, one way that this needle could have gotten in is that in the course of the preparation of these pads at some previous time a needle may have gotten stuck or attached to the pad and it was not seen or noticed, and it was sterilized with the other pads, and then came on our table; so that it was a needle that was brought into the wound by the pad that was used in the wound, the needle having accidentally gotten stuck to the pad at some previous time. The other way in my opinion that it could have gotten in was that the nurse and the second assistant, who in this case was Dr. Freiden, were the two men who would pass sponges to us——

"Q. [By Mr. Home] Two people, you mean?

"A. [By Dr. Olch] Dr. Freiden usually passed to Dr. Shulman these sponges, and they are kept on this little Mayo tray where these needles are, and it is perfectly possible that as a sponge is quickly picked up and passed into the field it may have picked up a needle with it, and when the sponge is used to pack off intestines, left in the wound in that manner."

It is agreed that under the doctrine of res ipsa loquitur plaintiff made a prima facie case against respondents, Drs. Olch and Shulman. Respondents argue that Dr. Olch gave his opinion, as an expert, that the needle got into the abdominal cavity in one of two ways; and that the opinion was admissible to rebut the inference of negligence raised by the doctrine of res ipsa loquitur. The doctor did not assert that he observed any occurrence or heard any statement or thing that would indicate that a needle did stick to a pad or was picked up by a sponge. He did not state any fact as a foundation for his opinion. His opinion was not based upon any occurrence during the preparation of the pads, or during the operation, from which an expert in surgery or otherwise could properly form an opinion that while packages of pads were being prepared in the supply room a needle actually did stick to a pad, and later the pad (with the needle adhering thereto) was placed in the abdominal cavity; or that a needle was picked up, during the operation, by a sponge

which was on the tray with the needle, and that the sponge (with the needle adhering thereto) was placed in the abdominal cavity. Such an opinion was in effect a statement that if any of the 50 nurses and attendants who helped prepare the pads in the supply room put a pad against a needle and the needle stuck to the pad, and if that pad with needle attached were brought into the operating room, and if they were placed in the body, the needle could have or might have become detached from the pad while the pad was in the body; or if a sponge upon a tray in the operating room picked up a needle which was also on the tray, and if the sponge with the needle attached were handed by a nurse to Dr. Freiden, and if he handed them to Dr. Olch, and if Dr. Olch placed them in the body, it is "perfectly possible" that the needle could have or might have become detached from the sponge while it was in the body. There was no evidence herein that any such factual conditions existed. There was no basis for assuming such a hypothetical set of facts as a basis for such an expert opinion. If such an opinion were admissible, it would seem that it would also be proper for a doctor, called as a witness by plaintiff, to testify (without any factual foundation for his opinion) that in his opinion it is "perfectly possible" that Dr. Olch or Dr. Shulman could have or might have dropped a needle into the body while they were using the needle holders or clamps in handing needles back and forth above the body. Also if such opinion evidence were proper, it would seem that the best witness, in a case similar to this, would be one with the best imagination as to the various combinations of events that could or might "possibly" cause a needle to be left in a body. The opinion herein of Dr. Olch was merely his conjecture as to how the needle could have or might have gotten into the abdominal cavity. It was prejudicial error to receive that evidence.

■ Said respondents (Drs. Olch and Shulman) also assert that in any event the evidence was sufficient to support the verdict on the theory that the jury found liability, but further found that plaintiff sustained no damage. They argue that there was substantial evidence that it was not necessary to remove the needle and that the needle in appellant's body was so encased in adhesions that it was harmless to plaintiff. (Testimony of Dr. Olch and other doctors called as witnesses by respondents.) Before the operation to remove the needle was performed, it was not known whether the

needle was encased in adhesions. Dr. Furnish testified that it was necessary to remove the needle, that it had punctured the colon, caused peritonitis and the illness which plaintiff suffered preceding the finding of the needle. The operation to remove the needle lasted about four hours, plaintiff was in the hospital 70 days, and the surgeon's charge for the operation was $5,000. Even if it be assumed that the testimony of Dr. Furnish was disregarded by the jury, it cannot be said that the leaving of the needle in plaintiff's body was beneficial or that it did not damage him to some extent. Even if it would have been good judgment, as said respondents assert, not to remove the needle, it cannot be said that the presence of the needle in the body was not damaging to plaintiff, at least to the extent that plaintiff suffered mental anxiety as a result of knowing that the needle was in his body. He said that he nearly went crazy and was very nervous when he learned about the needle. A finding that plaintiff was not damaged at all would not have been supported by the evidence.

Appellant also contends that the court erred in granting the motions for nonsuit by Dr. Freiden, the hospital and Miss Pearson. He argues that the doctrine of res ipsa loquitur was applicable as to them and that they should have been required to rebut the inference of negligence. He cites the case of *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], and asserts that under the decision therein the said doctrine was applicable to all the defendants herein.

In said Ybarra case the court said at page 491: ''Every defendant in whose custody the plaintiff was placed for any period was bound to exercise ordinary care to see that no unnecessary harm came to him and each would be liable for failure in this regard.'' Dr. Freiden assisted in the operation as second assistant surgeon, and in that capacity he performed duties ordinarily performed by an intern. As resident surgeon at the hospital it was his duty to assign interns and assistant resident surgeons to their various duties, and it was also his duty to assist the attending physicians and to direct the care of patients on the clinic service. Dr. Olch testified that in performing the operation herein there were four persons ''on the team'' in a group around the operating table; the team consisted of himself, Dr. Shulman, Dr. Freiden and a nurse; they ''worked as a team'' in the operation on plaintiff; his first assistant assisted him in making a cut; the sewing up inside and outside was done by him with

Dr. Shulman and Dr. Freiden assisting him. Dr. Freiden testified that he did not remember this particular operation; he found out that he helped Dr. Olch do an operation on plaintiff; he did not remember whether he pulled or handled any needles, and if he were second assistant he would have no occasion to do it. The participation of Dr. Freiden in the operation was such that, under the decision in the Ybarra case, he had custody of plaintiff jointly with the other doctors. The doctrine of res ipsa loquitur applies to Dr. Freiden.

As to the applicability of said doctrine to the hospital, it appears, as above shown, that Dr. Freiden was employed by the hospital as resident surgeon and was paid by the hospital. A hospital is liable for the negligence of its employee in caring for a patient in the hospital. (See *Cavero* v. *Franklin etc. Benevolent Soc.*, 36 Cal.2d 301, 308 [223 P.2d 471].) The doctrine of res ipsa loquitur was applicable to the hospital herein.

As to Miss Pearson, it appears that she, as supervisor of the nine operating rooms, assigned two competent nurses to attend the operation, that she was not present at the operation or any other place with plaintiff, and she had no control or custody of plaintiff. The said doctrine was not applicable to her. Furthermore, she was acting as a supervising employee of the hospital in assigning the nurses and, under the circumstances here, she would not be liable by reason of the assignment. In *Malloy* v. *Fong*, 37 Cal.2d 356, it was said at pages 378 and 379 [232 P.2d 241] : ''The doctrine of *respondeat superior* is not applicable to the relationship between a supervisor and his subordinate employees. . . . It is not the supervisor's work that is being performed. . . . For these reasons, the law has shifted financial responsibility from the supervisor, who exercises immediate control, to the employer. . . . Section 2351 of the Civil Code codifies this principle and has been uniformly interpreted to exempt superior employees from vicarious liability to third persons for the tortious conduct of subordinates.'' It was proper to grant Miss Pearson's motion for a nonsuit.

Appellant also contends that the action against Dr. Freiden and the hospital was not barred by the statute of limitations, since the action was commenced within one year after appellant discovered that the needle had been left in his body. Those respondents (Dr. Freiden and the hospital) assert that the action was barred as to them one year after June 25, 1946, the date the operation was performed by Dr. Olch. This action

was commenced on May 9, 1950. Appellant discovered on or about April 16, 1950, that the needle had been left in his body. As to Dr. Freiden, he participated in the operation in which a foreign substance (needle) was left in appellant's body.

■ If a surgeon performing an operation upon a person leaves a foreign substance in the body, the statute of limitations as to an action against him, based upon alleged malpractice, does not commence to run until the said patient has discovered, or by reasonable diligence should have discovered, that a foreign substance was left in his body. (*Pellett* v. *Sonotone Corp.*, 55 Cal.App.2d 158, 160 [130 P.2d 181]; *Costa* v. *Regents of the University of California*, 116 Cal.App.2d 445, 454-455 [254 P.2d 85]; *Huysman* v. *Kirsch*, 6 Cal.2d 302, 312-313 [57 P.2d 908].) In *Huysman* v. *Kirsch, supra*, the court applied the principle applicable in workmen's compensation cases, with respect to the statute of limitations, to a malpractice case. It was said therein at page 312: "The principle . . . approved by our decision [referring to a workmen's compensation case], was that the statute of limitations should not run against an injured employee's right to compensation during the time said person was in ignorance of the cause of his disability and could not with reasonable care and diligence ascertain such cause." It was further stated therein at page 313: "We can see no good reason why, if the statute of limitations did not begin to run in one case [workmen's compensation case], that it should run in the other [where surgeon left rubber tube in body]." The statute of limitations did not commence to run as to Dr. Freiden until appellant discovered that the needle had been left in his body. The action as to Dr. Freiden was not barred by the statute of limitations.

■ With reference to the hospital, it appears that Dr. Freiden was its agent and that since the action was not barred as to him it would not be barred as to the hospital. In *Costa* v. *Regents of the University of California, supra*, the plaintiff received X-ray and other medical treatments at the University of California Hospital from two physicians who were employed by the hospital. The hospital was conducted under the authority of the regents of the university. The last time plaintiff therein went to the hospital for treatment by the two physicians was January 10, 1947. That action was commenced November 5, 1948 (about 20 months after the last time plaintiff went to the hospital and physicians for treatment. Judgment in the trial court therein was in favor of the regents and the

physicians. On appeal therein, it was contended by the regents and the physicians that the action was barred by the statute of limitations. The court held, on appeal, that the action was not barred. The judgment in that case was reversed as to the regents and the physicians. The court said at pages 454 and 455: "[T]he rule is settled in this state that in malpractice cases the statute cited does not start to run until the date of discovery, or the date when, by the exercise of reasonable care plaintiff should have discovered the wrongful injury. . . . Although *Huysman* v. *Kirsch* and some of the cases following it related to foreign substances negligently left by the defendant in the body of the patient, the rule is not restricted to such cases. . . . In *Airola* v. *Gorham* [56 Cal.App.2d 42, 46 (133 P.2d 78)] . . . this court quoted the rule of *Huysman* v. *Kirsch* even as an example of a broader principle applicable also outside the field of malpractice. As in compensation cases . . . the issues when the plaintiff discovered his injury and its actionable origin, or should have discovered them . . . are questions for the trier of facts." In the present case, the action as to the hospital was not barred by the statute of limitations.

By reason of the above conclusion that the motion for a nonsuit was properly granted as to Miss Pearson (the supervisor), it is not necessary to discuss the contention that the action as to her was also barred by the statute.

 Appellant also contends that the court erred in striking out the testimony of Dr. Furnish to the effect that the established general practice in hospitals in this community in 1946 was that two nurses count simultaneously the sponges and instruments, which include needles. The motion of respondents to strike that testimony was made upon the ground that the witness was not qualified to testify on that subject. Dr. Furnish testified that he had practiced medicine and surgery in California since 1932, and since that time had performed an average of 400 or 500 major operations per year; in 1946 he was part owner of two hospitals, and was connected with the Bellevue, Alvarado, Suburban and Culver City Hospitals; that he had performed operations in the following hospitals: Hollywood Presbyterian, Methodist, Queen of Angels and St. Vincent's; he knew the practice, with respect to counting needles, in the Methodist Hospital and St. Vincent's Hospital but he did not know the practice in the following hospitals: Good Samaritan, California Lutheran, Hollywood Presbyterian, Queen of Angels, White Memorial or General. The

judge said, in ruling upon the motion to strike out the testimony, that the matter regarding the counting of needles in hospitals was immaterial. Dr. Furnish was a qualified witness. One of the nurses, present during the operation upon plaintiff, testified that she had no recollection of attending the operation; that at that time in 1946 she would not count the needles; that as the practice was in 1946 the other nurse would not routinely have counted the needles. The other nurse, present at the operation, testified that she did not remember attending the operation, and did not remember counting any needles from June 23 to September 6, 1946. The court erred in striking out said testimony of Dr. Furnish.

By reason of the above conclusions, it is not necessary to discuss other contentions on appeal.

The judgment (upon the verdict) as to defendants Dr. Olch and Dr. Shulman is reversed. The judgment of nonsuit as to Dr. Freiden and the Cedars of Lebanon Hospital is reversed. The judgment of nonsuit as to defendant Pearson is affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied September 30, 1953, and respondents' petition for a hearing by the Supreme Court was denied November 5, 1953. Edmonds, J., and Spence, J., were of the opinion that the petition should be granted.